## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KARI WHEELER, BRANDY LANCASTER,
SAMANTHA CORWIN and AUDRA ASHER,

      Plaintiffs,

      vs.

      Case No.

BOARD OF DIRECTORS OF STERLING FREE
PUBLIC LIBRARY; CITY OF STERLING; and
MICHELLE MILLER, individually; BOB BOLTZ,
individually; and LINDSAY WILSON, individually,

      Defendants.

## <u>COMPLAINT</u>

*"I have found the most valuable thing in my wallet is my library card." –Laura Bush*

**<u>The role of the First Amendment in the Sterling Free Public Library</u>**

    1.    The Board of Directors of Sterling Free Public Library ("Library Board") is a Government agency that has recently begun a spate of regulating content of its book offerings and displays based upon the desire to suppress certain viewpoints. The Supreme Court has held that Government decisions that are content-based "are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

    2.    Public libraries are public forums. When the government that runs them begins to make decisions based on content, that government runs afoul of the First Amendment.

    3.    Patrons of public libraries have a First Amendment right to information unburdened by the efforts of those in charge of materials and displays to indoctrinate others to their personal viewpoints. Those who run public libraries cannot dictate what citizens are permitted to read about and learn because those in charge disagree with and wish to suppress the ideas contained within

them (or, here, the ideas they believe may be contained in them). Doing so violates the First Amendment rights of the citizens who use their libraries.

4.      The Sterling Free Library is governed by the Library Board, which is created by Kansas statute and vested with the power to set library policy. Appointment of members to that board is done by the mayor with the approval of the City Commission. The mayor is also a voting member of the Library Board.

5.      The Sterling Library Board and City of Sterling delegate to Board Members and the Mayor the power to spend tax dollars gathered for the operation of the library. Inherent in that power is the Defendants' act under color of state law. The Library Board has engaged in viewpoint discrimination in violation of the First Amendment by refusing to purchase certain books because of their viewpoint and by ordering the removal of an educational library display because the Board and particular Board members disagreed with what they thought was the display's viewpoint.

6.      Defendants also acted under color of state law to deprive Sterling library patrons of procedural due process in violation of the Fourteenth Amendment by denying the public of proper notice and the opportunity to be heard before restricting the purchase of certain library books and forbidding certain displays which conflicted with the viewpoint of some Board members.

7.      Also, by engaging in sex discrimination by forbidding certain materials and displays because of a fear of "LGBTQ agenda," the Board violated LGBTQ citizens' rights to equal protection under the law. By forbidding displays that featured neurodivergent/autism advocacy and advocacy for those in wheelchairs, the Board violated the equal protection rights of those people and parents of children with those disabilities.

8.       Each day that Defendants are censoring books or displays at Sterling Library, those Plaintiffs who are patrons suffer irreparable injury. Plaintiffs, all library patrons, bring this action

for damages and injunctive relief to end Defendants' efforts to monitor ideas and restrict materials and to purge the library of any materials the Board or vocal Board members believe to diverge from their personal viewpoints.

**The Parties**

9.       Plaintiff Kari Wheeler is a resident of Sterling, Rice County, Kansas ("Sterling.")

10.      Plaintiff Brandy Lancaster is a resident of Sterling, Rice County, Kansas.

11.      The Board of Directors of the Sterling Free Public Library ("Library Board") is "a body corporate and politic" in Sterling, Kansas.

12.      Plaintiffs Wheeler and Lancaster were employees of the library and also were and are patrons of the library.

13.      Plaintiff Samantha Corwin is a City of Sterling resident who is a regular library patron. Plaintiff Corwin is neurodivergent and has a child who is neurodivergent. She advocates for public forums like the library to recognize and include neurodivergent adults and children. In addition, Plaintiff Corwin is an ally of LGBTQ citizens. She advocates for public forums like the library to recognize and include and not discriminate against LGBTQ people or neurodivergent or other censorship.

14.      Plaintiff Audra Asher is a citizen of Sterling who patronizes the public library. She is neurodivergent. She advocates for public forums like the library to recognize and include neurodivergent adults and children. In addition, Plaintiff Asher is an ally of LGBTQ citizens. She advocates for public forums like the library to recognize and include and not discriminate against LGBTQ people.

15.      Defendants Michelle Miller, Lindsay Wilson, and Bob Boltz are all members of the Library Board and are all citizens of Sterling.

16.     In addition to serving on the Library Board, Boltz is also the Mayor and a member of the City Commission and acts as liaison between the City Commission and the Library Board, charging the City with knowledge of the operation of the Library Board.

17.     The City of Sterling ("City") is a municipality. It owns the library building, the mayor **appoints the library board with the approval of the City Commission,** and the City approves the Library Board's actions annually. The City funds the Library Board's operations through a mill levy on property within the City of Sterling. The City Manager decides when a mill levy increase is appropriate. The mayor of the City of Sterling is a voting member of the Library Board.

18.     The Library's policy manual, which was approved by the City and is supposed to be provided to every member of the Library Board, states that "the Board treasurer is the custodian of all Library funds and has sole control over the expenditures thereof. **Notwithstanding this relative autonomy of the operation of a municipal service, i.e., a city or county library, as such it should be regarded as part of the parent municipality."**

19.     The City includes Plaintiff Wheeler and library staff in its KPERS contributions.

20.     The Library Board cannot raise funds to pay a judgment without the City's assistance, so because of the reasons above and because the City is responsible for funding the Library, the City is an appropriate party to this lawsuit.

**Jurisdiction and venue**

21.     This court has jurisdiction pursuant to 28 U.S.C. §1331 because this lawsuit alleges violation of federal laws and constitutional rights. It has pendant jurisdiction over any state law claims based on similar facts. Every defendant is a Kansas resident or Kansas body politic, so the

court has jurisdiction over each of them. Venue is appropriate because the violations of law occurred in Rice County, Kansas.

**Training of Library Board**

22.    The City of Sterling and the Library Board have a duty to ensure that those who serve as members of the Library Board have training and understanding of the role of Government in not restricting the First Amendment rights of those the library serves and employs.

23.    Given the power vested in the board, without training and understanding of the Government's First Amendment responsibilities, First Amendment rights can and will be violated. Those in power who believe they can dictate library operations to their viewpoint can suppress the First Amendment rights of others. Those in power who acquiesce without an appreciation of patrons' First Amendment rights can also violate patrons' First Amendment rights.

24.    Finally, without appropriate training, employees who speak up for those fundamental rights can have their careers sacrificed because of advocacy for the public's rights.

25.    The City and the Library Board members' failure to ensure that those in power understood their First Amendment responsibilities led to the plainly obvious consequence that Defendants Miller and Wilson would misuse their position to violate patrons' and employees' First Amendment rights.

26.    The Library Board is governed by Kansas law and its own Policy Manual and its bylaws.

27.    The bylaws provide that "The Board has the responsibility of making and directing the policy of the library, in accordance at all times with the statutes of the State of Kansas. Its responsibilities include promotion of library interests, securing adequate funds to carry on the work satisfactorily and the administration and control of library funds, property and equipment."

28.     The bylaws also provide that "The policy manual shall be adopted by the Board for the efficiency of the library's service to the public, for the operation of the library under the financial conditions set forth in the annual budget, and for such responsibilities as are delegated to the Librarian by the Board of Directors."

29.     The Library policy manual says "Trustees must distinguish clearly in their actions and statements between their personal philosophies and attitudes and those of the institution, acknowledging the formal position of the board even if they personally disagree with it."

30.     The Library Policy manual says "it is critical for library board members to have training in board development, group dynamics, effective meetings, funding issues, **library policy, advocacy**, community partnering, technology planning and other topics." (emphasis added)

31.     The policy manual and Kansas State Library Standards provide that new Library Board members should be provided an orientation about their duties and responsibilities. Upon information and belief, neither the Library Board nor the City has insured that the Library Board followed this policy. New members including those who served during the events described in this lawsuit received no orientation.

32.     The Kansas State Library Standards provide that Library Board members are to attend one continuing education class every year. Neither the Library Board nor the City followed this state standard, so Library Board members were not trained about their duties to avoid limiting Library programs and messaging and book purchases by their own viewpoint.

33.     Board members during the events described herein received no training from the City or from the Library Board about the Constitutionality of selecting or removing or failing to purchase books or modifying displays because of a disagreement about viewpoint. They received no training about the First Amendment rights of patrons to information even if it conflicted with

board members' viewpoints. They received no training about the requirements for open meetings under the Kansas Open Meetings Act and they received no training about Kansas Open Records.

34.     Once, when Plaintiff Wheeler asked the board what training or orientation new members added in 2022 or 2023 received, **Defendant Miller told her that every new board member received a copy of the library's policy manual and that was sufficient training.**

35.     Defendant Boltz, who serves on the Library Board as a representative of both the City and the Library admitted in August 2023 in an open board meeting that he **had never seen a copy of the library's policy manual. So, both the City and the Library Board were aware the Board members did not know the Library's policies.**

36.     Because the City and the Library Board knew members on the Library Board were not trained and did not receive or did not read a copy of the Library Policy Manual, the City knew that Library Board members had not learned the First Amendment violation hazards of viewpoint discrimination.

37.     Also, because the City placed members on the Library Board who were not trained about First Amendment violations, the Library Board was managed by those who did not know or understand that they could not terminate library employees for advocating for First Amendment protections for books and displays.

**Employment of Plaintiffs**

38.     Kari Wheeler was the Director at Sterling Free Public Library. She was hired in August 2022. She told the board in her interview that she had never been a librarian before.

39.     The board's policy handbook provides in the job description for Director that she "shall be responsible for the employment and direction of the staff in accordance with the personnel policy in the library's policy manual."

40.     The job description stated that as the Librarian her duties included "knowing the American Library Association and Sterling Free Public Library's position on service and access to library resources for all." Plaintiff Wheeler studied the Policy Manual and assumed that Library Board members had done the same.

41.     Brandy Lancaster was a library aide and the acting assistant librarian at the Sterling Free Library. She was hired in February or March 2023 and worked part-time. Her job description stated that her duties required that she "assist with library programs and displays as assigned by Director." Her job description did not allow her to make policy decisions. While Lancaster was employed by the library, she had never been written up, had any discipline or been counseled for her performance.

**The Sterling Free Library budget**

42.     The board's policy manual says that the Board Treasurer of the Library Board is to sign checks, reconcile the bank statements, make deposits, verify balances in regular and special accounts, assist the Library Director with the financial report of the annual state statistical report, and with the approval and guidance of the board, prepare and present the annual budget to the City Council.

43.     Defendant Miller was the Treasurer in 2022 and through half of 2023. The only one of the above duties she performed was signing checks. She did not verify balances or reconcile the bank statements. The Library did not make the statutorily required annual state statistical report, nor did it provide the City with a budget, even though both of these were required by statute.

44.      Defendant Boltz knew that the Library did not make annual reports or create a budget and, as he was the City's representative, the City knew this as well.

45.     For several years prior to Plaintiff Wheeler's hire, no one—not the Board Treasurer or the Library Director—had prepared a budget or made an annual report. The City had not received a budget from the library for at least the five years prior to Plaintiffs' termination and no one had been counseled or criticized or disciplined about this. The City had not asked for a budget prior to 2023.

46.     When Plaintiff Wheeler interviewed for the Library Director job, she was not told that it would be her responsibility to create a library budget from scratch. Despite this, and despite the job being assigned to the Board Treasurer rather than the Library Director, Wheeler was assigned the creation of the library budget in the spring of 2023. Because there was no record of previous Library budgets, there was no template available.

**The Library Board**

47.     The Library Board is appointed by the City but minutes show that in 2023, the Library Board nominated and voted on their own new members among themselves. The City (other than Mayor Boltz, who apparently approved of and participated in this process) did not do anything other than rubber stamp the Library Board's chosen new members. By implication, the City had delegated its job of selecting Library Board members to the Board itself in violation of state statutes.

**Plaintiff Wheeler's performance**

48.     Plaintiff Wheeler received an evaluation from the board in May that was primarily drafted by Defendant Miller. The evaluation criticized the way she had handled story time, told her the order in which she should assign crafts to children (coloring should be after the craft, according to her evaluation), ordered her not to set any limits on the number of books that could be checked out at one time (which was contrary to written library policy from the Library

handbook), and suggested other micromanaging ways Defendant Miller and her friends would like the library to operate. The Library Board met in executive session and ratified Defendant Miller's evaluation and presented it to Plaintiff Wheeler.

49.     After receiving the Miller/Library Board evaluation in the May meeting and after the May meeting was adjourned, Plaintiff Wheeler asked the board president, Jeremy Stinemetz, if she should be "worried for her job." He assured her that she should not, that things were going fine between her and the Library Board. No board member contradicted him, though the question was asked when most were still present. This conversation occurred less than two months before she was terminated.

50.     The next month, at the June 29, 2023, special board meeting, the board invited Scott Bush, the attorney for the Board and the City to meet with them in executive session. Upon information and belief, Bush's bill for that meeting was paid by the City.

51.     After the Library Board special meeting, both Plaintiffs Wheeler and Lancaster asked President Stinemetz if they should be worried about their jobs. He said no. They asked in front of a third party if they should get their own attorney since the board was calling in an attorney. He responded, "I can't tell you no, but I don't see why you would." No board member challenged either of these statements and Wheeler and Lancaster believed Stinemetz.

**Plaintiff Lancaster's performance**

52.     Plaintiff Lancaster reported to Plaintiff Wheeler, not the Board. She had never received any write-ups or discipline and had only spoken at a board meeting once. Wheeler was satisfied with Lancaster's performance. Prior to Lancaster's involvement in the display at the library's entry, the **only** comment Wheeler heard from the board about Lancaster came from Miller

who told Wheeler in April or May 2023 that the Board did not want Lancaster to smoke in front of the library. Wheeler told Lancaster, and Lancaster did not smoke in front of the library again.

53.     Plaintiff Lancaster created the display for the library entry in June of 2023. While she was working on it, her coworker Splitter pointed to the neurodivergent/autism logo, which was multi-colored and then launched into an anti-LGBT diatribe. Lancaster assured Splitter that the symbol was about neurodiversity/autism.

**The William Allen White Award books**

54.     The William Allen White Children's Book Award is the oldest statewide children's book award in the United States.

55.     Books that receive the award are chosen annually by a selection committee for qualities of originality, vitality, clarity, factual accuracy, respect for the reader and broad general appeal to and acceptance by children. Members of the selection committee come from these organizations: Emporia State University Teachers College and School of Library and Information Management; Kansas Association for Childhood Education International; Kansas Association of Elementary School Principals; Kansas Association for Family and Community Education; Kansas Association for Middle Level Education; Kansas Association for Supervision and Curriculum Development; Kansas Association of School Librarians; Kansas Association of Teachers of English; Kansas Congress of Parents and Teachers; Kansas Library Association - Children's and School Libraries Section; Kansas National Education Association; Kansas Reading Association; and Kansas State Department of Education, as well as at large community members.

56.     A library patron suggested to Plaintiff Wheeler in the spring of 2023 that the library purchase the 2023 William Allen White Award-winning books for 3rd-5th and 6th-8th graders. The

Sterling school district had traditionally rewarded students who read all of the William Allen White Award-winning books. The patron hoped the books would be available at the public library. There were eight books on the younger children's list and eleven on the 6th to 8th grade list. The patron gave Wheeler a copy of the two lists of books that had won the award for that year.

57.    Wheeler told the board during a board meeting in the spring 2023 that the patron had suggested purchasing the books and that she thought the library could purchase them with funds in a memorial fund bank account. The board did not object to the content of the books at that meeting, but suggested she wait until the budget was complete before ordering them so that she could confirm that she would have sufficient funds. Wheeler did not object to the suggestion that she wait until the budget was complete.

58.    Sometime after the board meeting where the books were discussed and before the next monthly library meeting, Plaintiffs Wheeler and Lancaster were in a restaurant in Sterling discussing their employer's finances and brainstorming about ways to improve the library.

59.    A fellow diner whom Plaintiff Wheeler had known since high school overheard them and suggested that his employer would likely agree to purchase and donate the books to the library. Plaintiff Wheeler told him about the William Allen White books the library wanted to buy, and he told her how to request the funds from his employer.

60.    At the next library board meeting, Plaintiff Wheeler told the Board that she hoped her friend's employer, Oneok, would purchase the William Allen White books. She told the board she had exchanged emails with the appropriate person there and she had provided Oneok with everything except for Library's final budget.

61.    During that meeting, board member Miller objected to the purchase of one of the William Allen White books, *Flight of the Puffin,* and suggested that the library purchase all of the

books on the award-winning list except that book. The book features several teen characters who try to support one another in their efforts to be their authentic selves despite pressures from others around them. One of the teen characters is non-binary and uses the pronoun "they." Another board member, Fulton, agreed with Miller. No board member disagreed with Miller or Fulton or suggested that refusing to purchase only one of the award-winning books because of its viewpoint was inappropriate.

62.     Plaintiff Wheeler told the board and Defendant Miller in that meeting that it would be "wrong" when purchasing the set of award-winning books to omit only one book because of its viewpoint. She told them that it would violate board policy as contained in the Library's policy handbook and would be censorship. She suggested the board read *Flight of the Puffin* before recommending it be excluded. Ms. Miller was adamant that the book should not be purchased. No board member challenged Ms. Miller during the meeting and no board member expressed any support of Plaintiff Wheeler's statements or cautioned Miller about demanding that they refuse to purchase a book because of its viewpoint.

63.     During the same board meeting, Defendant Miller and Board member Fulton and perhaps other board members suggested that if Wheeler insisted that the Library Board purchase *Flight of the Puffin* that it "not be out on the shelves but be kept in [the librarian's] desk drawer." Plaintiff Wheeler explained that it was not a solution to purchase a book and hide it because of its viewpoint. Again, she warned that to do so would be censorship. Again, no board member spoke up and disagreed with Miller and board member(s) who suggested hiding the book. No board member spoke in support of Plaintiff Wheeler's comments.

**Library Board's Vote not to Sponsor the Sterling Fourth of July Parade Because it Contained A Pride Float**

64.     At the June 12 meeting, the Library Board discussed and voted on whether to contribute to Sterling's annual Fourth of July parade. The Library Board had always supported either the parade or the celebration afterward. Miller and other board members discussed that this year's Fourth of July parade would include a "Pride" float. That was the only reason anyone suggested that the Library Board not support the parade as it had in the past. After the anti-Pride, anti-LBGT statements, the board voted not to support the Fourth of July parade. No board member challenged the anti-Pride statements as the basis for refusing to support the parade.

65.     During that board meeting, Plaintiff Lancaster attended but did not speak to the board.

**The Summer Reading theme and the entry display**

66.     Summer reading programs at libraries nationwide used the theme "All Together Now." During the April and May board meetings, Ms. Wheeler mentioned the summer reading program and gave the board the opportunity to look at a guidebook she had received from the American Library Association that explained the theme.

67.     On Ms. Wheeler's instruction, during the month of June Plaintiff Lancaster created a display **that was not in the children's area** but that was consistent with the theme**.**

68.     The display she created was in the library entry in an area in which the library traditionally displayed themes. Lancaster made her own choices about what books and artwork she included. She had downloaded some artwork from the internet that focused on diverse themes.

69.     Included in the display was a photo with five primary colors in the background, a silhouette of a child in a wheelchair and a quote by Maya Angelou that said, "In diversity there is beauty and strength." A photo of the display that shows the artwork is below:



70.     **The display included both children's books and very adult books that would be inappropriate for children.** Books displayed included *Emma & Mommy Talk to God*, *The Color Purple, Uncle Tom's Cabin, Separate is Never Equal, Wonder*, and *To Kill a Mockingbird*.

71.     An infinity sign made of multi-colored pieces with the slogan "We all think differently" was included in the display as well. The multi-colored autism or neurodivergent logo Lancaster chose was, according to internet websites "used to represent neurodiversity, which 'describes the idea that people experience and interact with the world around them in many different ways; there is no one "right" way of thinking, learning, and behaving, and differences are not viewed as deficits.'" Both children and adults can be neurodivergent.

72.     On June 22, a temporary summer library employee, Ruth Splitter, told Lancaster that she found the multi-colored infinity symbol offensive because she thought it symbolized gay pride. Lancaster told her it was a neurodiversity/autism logo. Splitter launched into an anti-gay story about conflict in her family.

**Miller promises to disrupt the display using her seat on the Board**

73.    The same day, Splitter complained in a text to Defendant Miller that Splitter found the logo offensive and thought it symbolized "gay pride." She and Miller agreed that Miller would use her position on the Library Board to have Lancaster and Wheeler remove the autism symbol from the display. Defendant Miller replied to Splitter in a text that "we are meeting for the board meeting tomorrow and can address it if needed." She assured Splitter in a text "we're not going to have that display up *because I will rally the board members* to call [Wheeler] to take it down." (Emphasis added.)

74.    The same day, within half an hour of her text exchange with Splitter and her promise to have the display taken down through her position on the Library Board, Defendant Miller sent a text to Plaintiff Wheeler that said:

> Hey Kari. I stopped in to the library this afternoon and noticed some rainbow looking signs on the table by the circ desk. I do not want any kind of rainbow display (aside from solely colors focused) especially in this month. We have a conservative town and as a library do not need to make political statements (see Target and Budlight as negative examples). **I certainly do not want the library to promote LGBTQ agendas**. (emphasis added)

75.    About 45 minutes later, Defendant Miller sent a follow-up text:

> Please let me know if I miss understood (sic) the display. I am totally fine with diversity of skin color display, just not represented with rainbow 🌈 colors.

76.    Also on June 22, another City employee and Miller's fellow parishioner at her conservative church, Jessi Dobson, texted Miller encouraging her to use her position on the Library Board to have the five-colored sign with the Maya Angelou quote and the drawing of the girl in the wheelchair removed along with the multicolored autism/neurodivergent logo. Dobson sent by text a picture of the girl in the wheelchair with five colors in the background and said, "this is not

okay." She reported that the sign and the autism/neurodivergent logo made her "sick to her stomach." She asked whether the American Library Association was "driving this?"

77.    Miller **again** promised to use her position on the Library Board to have the rainbow-colored items taken down and reiterated that she "100%" agreed that she did not want someone to "promote and encourage this to my children." In their text exchange, Defendant Miller admitted that contrary to her statement in the earlier text to Wheeler, she had not been in the library that afternoon.

78.    Later, on the afternoon of June 22, Dobson told Wheeler at the library that she would not bring her children to the library if the display did not come down. She spoke so loudly that patrons on the next floor could hear her. She told Wheeler that the library "is supposed to be a safe place." Wheeler replied "Yes, it is to be a safe place for everyone." Wheeler told Dobson that the purpose of the display was to emphasize inclusivity. She explained that the picture of a child in a wheelchair and the Maya Angelou quote were important to inclusivity. She shared her years of experience with children with autism/neurodiversity and her work with those children in the Library and why it was important to represent those groups there. Upon information and belief, Dobson shared this conversation with Miller. Wheeler removed the display temporarily, subject to instructions from the board at the meeting she knew would take place the next day. Wheeler did not intend for Dobson's complaint to be the final word on the display.

**The June 23 Board meeting**

79.    At the next board meeting, which was a special meeting called for the very next day, June 23, 2023, Plaintiffs Wheeler and Lancaster distributed materials to the Library Board by placing a packet of excerpts from the state library board's handbook and from library statutes that they had highlighted. The materials defined censorship and included the portion of the board policy

manual that did not allow censorship or making decisions for the public library because of viewpoint.

80.     At the meeting, Wheeler spoke to the Library Board as a whole and reiterated they should not be omitting books or changing displays just because it did not agree with their viewpoint. She mentioned Miller's text about wanting to omit portions of the display. Miller then spoke to the board about the text.

81.     Wheeler thought that when Miller told the Board about the text, she omitted some of the words, so Plaintiff Wheeler read both of Miller's texts about the display to the entire Board verbatim. Wheeler said she was uncomfortable with making changes to the display because of Miller's disagreement with some of the material's viewpoint. Again, no board member took issue with Miller's anti-gay statements and no board member openly agreed with Wheeler that limiting the display because of viewpoint was problematic. When the board members exited the meeting room, not one Board member took the highlighted materials Wheeler and Lancaster had provided for them to review.

82.     Lancaster attended the June 23 meeting. The Library Board knew that she had helped Wheeler highlight and distribute the censorship materials they were given in the previous meeting. Lancaster told Board members Wilson and Stinemetz in earshot of all members of the Library Board that if she were not allowed to make displays with color in June because of the board's worry about Pride month, then her displays that month would all have to be in black and white. She expressed her dismay that she and Wheeler were being ordered not to display the diversity materials she had chosen because of the board's fear of Pride's celebration of LGBT ideas.

**Wilson's change of the June 23 board minutes**

83.     Immediately after the meeting, Defendant Wilson circulated minutes via email that reported the conversation during the meeting this way:

> Kari brought up concerns about two pictures displayed; whether or not she should or should not display them. The consensus from the Board seemed to be that the timing of the display was bad, the display was unclear and brought confusion and that the best practice in these matters,(sic) for a Library, is to remain neutral.

84.     After Wheeler and Lancaster's termination, Defendant Wilson changed the minutes. In response to a KORA request, the library provided a current version of the minutes of the June 23 meeting. The minutes drafted by Wilson had changed **though no board minutes reflected any requested amendments.** The changes include a claim that Wheeler made the decision to take down the display, labeling Wheeler as "combative," and including Wilson's statements in the minutes. The current minutes say:

> Library Director Wheeler brought up concerns about two pictures displayed in the library; she said a patron had asked her to remove one of them and because of that request she chose to do so. Library Director Wheeler then brought up a text conversation between herself and Vice Chair Miller regarding the pictures in the display. Library Director Wheeler turned very combative toward Vice Chair Miller. Wilson addressed Library Director Wheeler, stating there is no need address anyone in such a manner. The conversation ended with the board coming to a consensus that the timing of the display was bad, the display was unclear and brought confusion and that the best practice in those matters, as a Library, is to remain neutral.

## The Board's agreement with Miller's statements and actions in the June 23 meeting

85.     In a text message report to her friend and city employee Dobson after the June 23 board meeting, Defendant Miller reported that when she made orders about the displays **"all the other board members backed me and were supportive"** about the removal of the sign with the girl in the wheelchair and the autism/neurodivergent logo that Miller and Dobson had earlier

interpreted as "LGBTQ agendas." In subsequent texts, Miller and City employee Dobson celebrated that Plaintiff Wheeler had taken down the sign with the child in the wheelchair.

86.     Censoring the display that advocated for the inclusion of advocacy for disabled and neurodivergent/autistic because of the arbitrary and irrational fear of an "LGBT agenda" and because seeing a multi-colored display and advocacy symbol made Dobson "feel sick" deprived the First Amendment rights of library patrons from Sterling who are entitled to a library that embraces a range of viewpoints, not just the viewpoints of those with an aversion to rainbow colors and a disdain for LGBTQ citizens.

**The June 29 board meeting**

87.     The Library Board met again on June 29 in special session. Wheeler and Lancaster again had materials about censorship available and handed them to each member of the Library Board. Every member took the materials except Defendant Miller, who pushed them away and said, "I already know this."

88.     The Board or the City had invited Scott Bush, the attorney for the City, to the meeting. The Library Board was in executive session with counsel for almost an hour but adjourned without taking any employment action.

**The June 30 letter from a patron protesting censorship**

89.     On June 30, 2023, Plaintiff Wheeler forwarded board members a letter from a library patron that had been sent to the library email address that said, in pertinent part:

> It has come to my attention that due to topics of diversity and inclusion in the summer reading program there are certain books under discussion. I strongly urge you to keep these books in the library to uphold the right of all young people in our community to read...in banning or hiding these books you are suppressing young people's ability to engage in difficult discourse, for fear of "inappropriateness" or offensiveness." This teaches young people that the way to handle these topics is to avoid them. Oftentimes, young people cannot avoid these topics because they are the

ones living these topics. I am writing to urge your support as we strive to protect all children's and teens' rights to read as well as the rights and livelihood of the authors who are affected by this challenge.

90.     After Plaintiff Wheeler forwarded the letter to all members of the Library Board on June 30, Board President Stinemetz contacted her and said, "What is this about?" Wheeler said she did not know the author, but that it came to the library email address and was addressed to the Board and she was passing it on to them.

91.     In fact, the author of the letter did not know Wheeler or Lancaster, had not spoken with either of them, and was not familiar with the controversy over the display. It was a coincidence that her letter with censorship concerns arrived June 30.

92.     The library was closed from June 29-July 5.

**The July 5 Board meeting and terminations of Wheeler and Lancaster**

93.     On July 5, **the very next business day after receipt of the censorship letter above,** the Library Board met in a special meeting and went immediately into executive session. They deliberated 22 minutes and then left executive session. Defendant Stinemetz moved to terminate Wheeler's employment and all but one board member voted in favor. Stinemetz told Wheeler in the meeting only that "she had lost the confidence of the board to effectively perform her position."

94.     After this, when Plaintiff Lancaster got up to leave the meeting, Defendant Miller told her to "sit down" and then the Board voted to terminate Lancaster's employment, stating that it had "lost confidence" in her ability to do her part-time job as well. Upon information and belief, this was the first time in the history of the Library Board that a part-time employee was terminated by the Board.

**Miller's continued representation that she ordered "LGBTQ agenda" items removed**

95.     After the termination, Defendant Miller told the media that she and the Board had ordered the display at the library removed because "Well, being that it was June, **I believe the focus was to promote an LGTBQ agenda."**

**Boltz's termination of Plaintiffs**

96.     Defendant Boltz, the City's representative on the Library Board and the Mayor, voted to terminate Wheeler's employment on July 5, 2023.

97.     After Plaintiffs' termination, in his role of chair during a City Council meeting, the Mayor ratified the Library Board's decision with a statement that said, in part:

> Concerning the termination of the library director, all I will say is that she lost the confidence of the board to meet the requirements of her job. The Board had worked with her for several months to meet those requirements, but it determined that it was best for the library that the director and the library part ways. Often when personnel matters are discussed, due to privacy and other considerations, only one side of the issue is made public. I do believe the Board collectively believed their action was in the best interest of the library.

**Redacted Records Submitted by the Library in Response to Kansas Open Records Act Request**

98.     On July 21, 2023, counsel for Plaintiffs submitted a request for Open Records from the Library. The request was filled by the current interim Library Director.

99.     Included in the records provided were emails supplied by Defendants Wilson and Miller that pertained to complaints by patrons about the Library.

100.    Some of the emails supplied had the names of the senders redacted, though none of the Library's responses disclosed that the documents had been redacted or the rationale for the redactions.

101.    On August 15, 2023, counsel asked in writing that the originals of the redacted documents be supplied and that the Library confirm that other documents had not been redacted.

The Library Director asked for clarification of the request but never fulfilled it. Unredacted documents have still not been supplied. The City was also informed of the Library's redaction, but said the decision was up to the Library.

**Count 1—Claim by Wheeler and Lancaster for 42 U.S.C. § 1983 Retaliation in violation of First Amendment Rights against the Library Board and City of Sterling and Michelle Miller and Lindsay Wilson and Bob Boltz**

102.    Plaintiffs incorporate all prior paragraphs.

103.    Plaintiffs Wheeler and Lancaster were public employees.

104.    Defendants, both the individual Defendants and the members of the Library Board and the City, were operating under color of state law.

105.    Both Plaintiffs Wheeler and Lancaster spoke out as citizens on matters of public concern—the First Amendment rights of citizens of Sterling not to have the library books and displays censored because of the viewpoint of members of the Board, the rights of LGBTQ voices to be heard in a public library, the right of advocates for autism education to have their symbol displayed even though it was multi-colored, and the right of the disabled to be included in a display with the theme "All Together Now." Both objected to instructions to remove the multi-color display because of Defendant Miller's and her friends' obsessive but still incorrect fear that it conveyed an "LGBT agenda." Plaintiff Wheeler forwarded an email to the library board that chastised them for censorship the last business day prior to being fired. All of these subjects were matters of public concern.

106.    The ability of the Library Board to engage in viewpoint discrimination while acting as a public agency and spending public dollars was a matter of public concern.

107.    The Library Board terminated the employment of both Plaintiffs in retaliation for their speaking out as citizens on matters of public concern.

108.    The Library Board had not received training on the First Amendment rights of citizens to have access to information in a public library free of government intervention to suppress a viewpoint.

109.    The City and the Library Board had a duty to ensure that volunteers who exercised government control over materials purchased or displayed at the library were adequately trained.

110.    The failure to require or provide training, the refusal of Defendant Miller to review materials about censorship, the failure of Defendant Boltz and the City to require members learn and have available the Library Policy manual, the failure of the Board to follow their own bylaws and policy—all led to the termination of Plaintiffs.

111.    Once there was media attention, the Library Board and the City attempted to publicly distance themselves from Defendant Miller's anti-LGBT statements by claiming that she "does not speak for the entire board." This was a public attempt to revise history.

112.    At the June 12 meeting, the Board, at Miller's urging, voted to depart from its annual tradition of supporting the Sterling Fourth of July parade and celebration because the parade would include a Pride float. Though they omitted that reason from their meeting minutes, their discussion and vote did not mention any reason other than the inclusion of an LGBT float and the "controversy" that caused.

113.    At the June 23 meeting, the board listened to Defendant Miller's anti-LGBT statements both at the board meeting and when Plaintiff Wheeler read Miller's anti-Pride and anti-LGBT texts aloud and **not one library board member objected**. Later, the entire board approved of minutes that supported Miller's statements. Defendant Miller's contemporaneous report to her co-conspirators was that the board "backed her and were supportive" of her anti-LGBT rhetoric during that meeting.

114.    In addition, the Board ratified and supported Defendant Miller when Defendant Wilson revised the minutes after Wheeler's termination to say that Plaintiff Wheeler had decided to remove the display on her own and that her strenuous objection to their censoring and interference with the library's purchases and displays was "combative." Defendant Wilson revised the minutes to assist in the manipulation of the record to justify the two terminations.

115.    Defendant Boltz, who was mayor and the representative of the City on the Library Board, voted to terminate Wheeler, knowing that Board members did not have training or access to the policies Wheeler was advocating.  Defendant Boltz did not ensure that either the Library or the City followed either Kansas statutes or Board policy in the selection of board members or in the training of Board members. The City, through Boltz, knew that the Library Board was not properly trained and that the risk was they would indulge in viewpoint discrimination, but Boltz, the City and the Library Board were indifferent.

116.    Defendant Boltz, knowing about the statements of Miller and the retaliation in the two terminations ratified both terminations on behalf of the City in his post-termination statements.

WHEREFORE, Wheeler and Lancaster pray for judgment against all Defendants for past lost wages and benefits, future wage loss, compensatory damages, attorneys fees and costs and all other relief which the court finds just and equitable.

**Count 2—Claim by All Plaintiffs for 42 U.S.C. § 1983 Violation of First/Fourteenth Amendment because of Viewpoint Discrimination Against the Library Board and City of Sterling**

117.    All prior paragraphs are incorporated here by reference.

118.    The First Amendment protects the right to access and receive information and ideas.

119.    Viewpoint discrimination is censorship based on a government actor's judgment that the content of speech does not comport with the beliefs of the government actor.

120.    Defendants Miller and Wilson engaged in viewpoint discrimination in violation of the First Amendment. The Board, in acquiescing to Miller's insistence that *Flight of the Puffin* not be purchased or, if purchased then it be hidden, and that materials that made Miller's friend "sick to her stomach" and included an autism symbol and a Maya Angelou quote be removed from the library.

121.    Materials Defendant Miller advocated for removing and the Board agreed were removed specifically because of her perception of their message ("LGBTQ agenda") and wanted to suppress and censor the public's access to materials.

122.    The Library Board's response to Wheeler affirming Miller's instructions to take down the multi-colored displays about autism/neurodivergence and about the child in the wheelchair simply because of Miller's insistence that they had "an LGBTQ agenda" that she wished to suppress was impermissible and unconstitutional content-based viewpoint discrimination that violated Plaintiffs' First Amendment rights. The Library Board approved minutes that found that the display was inappropriate.

WHEREFORE, Plaintiffs pray for damages, for declaratory and injunctive relief and for attorney's fees and for all other relief, whether at law or equity, to which they are entitled.

**Count 3—All Plaintiffs' Claim Against Library Board and the City for 42 U.S.C 1983 Due Process**

123.    Patrons of the Library, which include all Plaintiffs, have a liberty interest in access to information that is protected by the Due Process Clause of the Fourteenth Amendment.

124.    There is a First Amendment right to access information and ideas, and First Amendment protections apply to the censoring of books and materials in public libraries.

125.    Defendants' conduct was substantially motivated by a desire to exclude two things: *Flight of the Puffin*—a book that promoted an idea with which either they all disagreed, or they

acquiesced in Defendant Miller's very vocal disagreement.  The board did not reject her suggestion that they refuse to purchase or, if purchased, that they hide a book that recognized a transgender teen. Also, the board, as memorialized in their own minutes, forbade a display about autism advocacy and a Maya Angelou quote because their colors were construed by Defendant Miller, with the acquiescence of the board, as being inappropriate because they (in her words) "promote an LGTBQ agenda."

126.    The Library Board acted arbitrarily and unreasonably in its decision to substantially and directly interfere with the rights of library patrons including these Plaintiffs by making their purchases and displays according to their viewpoint, which excluded books about a trans teen and modified a display about autism and disability.

127.    Defendants' own original and doctored minutes of their June 23 meeting demonstrate that they ratified the removal of the display that celebrated a disabled child and contained a Maya Angelou quote and displayed an autism/neurodivergent advocacy symbol because of Miller's vocal disagreement with what she and her friends interpreted to be "an LGBT agenda", which was inconsistent with her viewpoint.

128.    Defendant Miller was explicit both in the press and in board meetings and with Library employees in text messages and with her friend who "felt sick at her stomach" that Miller interpreted the display to have "an LGBT agenda" and she was "not having that" at the Sterling library. After she was successful in removing the two art pieces, she celebrated in text messages that the Library Board "backed her and were supportive of her." This was a reasonable conclusion because **no one on the board ever challenged her anti-Pride and anti-gay statements, nor did they take any action inconsistent with those.** According to the minutes, the board agreed with her characterization of the display as inappropriate. In early June, the board had sided with her

when she advocated against the Fourth of July parade because there would be a Pride float. Both Miller and the board characterized references to gay or trans teens as "controversial"— as if a person' existence could be controversial.

129.    Defendant Wilson changed the board's minutes after Plaintiffs' termination to emphasize that the board found the library display objectionable and found Wheeler's advocacy against viewpoint discrimination objectionable as well.

130.    Content-based restrictions on speech are presumptively unconstitutional and subject to strict scrutiny. The Board's removal of the display and its refusal to purchase *Flight of the Puffin* are clearly content based restrictions on speech.

WHEREFORE, Plaintiffs pray for damages, for declaratory and injunctive relief and for attorney's fees and for all other relief, whether at law or equity, to which they are entitled.

## Count 4—Violation of Equal Protection Against the Library and Miller by Plaintiffs Asher and Lancaster and Corwin

131.    The Library Board has made choices in the books it chooses to buy and the displays it chooses to censor that exclude certain groups of citizens.

132.    The Library Board ordered/ratified Miller's order of the removal of the neurodivergent/autism symbol because of its misunderstanding and/or indifference to its viewpoint. There is no question that it was intentionally removed despite the Board's being informed that it was included to represent neurodivergent/autism advocacy for families with that condition.

133.    Plaintiffs Asher and Lancaster and Corwin are members of the group represented by the neurodivergent/autism advocacy symbol. They are similarly situated to others whose "differences" were highlighted in the Library's original "All Together Now" display, yet the group

to which she belong was treated differently because their symbol was removed at the insistence of Defendant Miller and with the acquiescence/ratification by the Board.

WHEREFORE, Plaintiffs Asher and Lancaster and Corwin pray for damages, injunctive relief, attorney's fees and other such relief as the court deems just and equitable.

## Count 5—Violation of Kansas Open Records Act against the Library Board by Plaintiffs Wheeler and Lancaster

134. The Library received a KORA request submitted by counsel, but provided some documents that had been redacted without an explanation or justification of the redaction. The documents were emails that had the sender's name redacted.

135. Though there were at least two follow up requests, the Library still has not complied with the KORA request by providing the unredacted documents requested or by explaining its refusal to do so.

136. K.S.A. 45-218 provides that "If the request for access is denied, the custodian shall provide, upon request, a written statement of the grounds for denial. Such statement shall cite the specific provision of law under which access is denied and shall be furnished to the requester not later than the end of the third business day following the date that the request for the statement is received." By not responding, the Library has denied the request for unredacted documents and is in violation.

137. K.S.A. 45-222 provides that an agency can be liable for attorney's fees if its failure to comply with the Act is not in good faith and without a reasonable basis in fact or in law. Failure to respond to multiple requests is not in good faith.

WHEREFORE, Plaintiffs Wheeler and Lancaster pray for injunctive relief and for their attorney's fees and for other such relief as the court deems just and equitable.

Respectfully Submitted,


/s/ Gaye B. Tibbets
Gaye B. Tibbets, #13240
HITE, FANNING & HONEYMAN L.L.P.
100 N. Broadway, Ste. 950
Wichita, Kansas  67202
Tel:  (316) 265-7741
Fax:  (316) 267-7803
Email:  tibbets@hitefanning.com


## **REQUEST FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury on all claims triable to a jury.


/s/ Gaye B. Tibbets
Gaye B. Tibbets, #13240